283 F.2d 628
 UNITED STATES of America,
v.
Nicholas BARBONE, Appellant in No. 13,189,
Albert Di Michele, Appellant in No. 13,190,
Ignatius Esposito, Appellant in No. 13,191,
Michael Pisano, Appellant in No. 13,192,
Louis Diccio, Appellant in No. 13,193,
Michael Lettera, Appellant in No. 13,194,
Joseph Pagano, Appellant in No. 13,195.
 Nos. 13189-13195.
 United States Court of Appeals Third Circuit.
 Argued September 12, 1960.
 Decided October 20, 1960.
 
 G. Fred DiBona, Philadelphia, Pa. (Grover C. Richman, Jr., Richman & Berry, Camden, N. J., for Nicholas Barbone, Appellant in No. 13189; Benjamin Asbell, Camden, N. J., for Louis Diccio, Michael Lettera and Joseph Pagano, Appellants in Nos. 13193, 13194 and 13195, respectively, on the brief), for appellants.
 John H. Mohrfeld, 3rd, Asst. U. S. Atty., Camden, N. J. (Chester A. Weidenburner, U. S. Atty., Newark, N. J., John G. Kissane, Regional Counsel's Office (Alcohol and Tobacco Tax Div.), Philadelphia, Pa., on the brief), for appellee.
 Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.
 McLAUGHLIN, Circuit Judge.
 
 
 1
 Appellants together with seven other persons were charged in a four count indictment with conspiracy to operate, etc., as well as the substantive crime of operating an illicit still.[1]
 
 
 2
 During the trial, three of the defendants, Carmen Bruno, Samuel Coraluzzo and Albert Marzullo were acquitted on motion. Another defendant, Anthony Lampone, was granted a severance prior to trial. The jury returned a verdict of guilty on Count 1 of the indictment against Francis La Macchia and a verdict of guilty on all four counts against the seven appellants and two other defendants, Joseph La Macchia and Louis Orseno. Francis La Macchia, Joseph La Macchia and Louis Orseno, have not joined in this appeal.
 
 
 3
 Error is alleged in the court's refusal to grant a mistrial, when on recross-examination, the government's main witness, Emidio Teti, answered that he had been threatened. A review of Teti's testimony and the circumstances surrounding his answer demonstrates that the trial judge's denial of the motion for mistrial was correct.
 
 
 4
 Teti testified that sometime during March 1958, he was introduced to appellants Esposito and Barbone and was employed by them as a truck driver. He testified that at Esposito's request, he came to Philadelphia and met there with another of appellants, Pagano, and that a tractor was purchased and titled in his name by Pagano. Subsequently a trailer was obtained by a similar arrangement. With this equipment, under the direction of Esposito, Teti would pick up and load sugar and other raw materials at a garage on Queen Street in Philadelphia, Pennsylvania and transport them to the still in Vineland, New Jersey. At the still, he would unload the raw materials, load alcohol on the trailer and return to the Queen Street garage. He clearly identified each of the defendants and described their participation in the conspiracy.
 
 
 5
 In their effort to discredit Teti counsel for the defendants extensively cross-examined him, placing particular emphasis on the circumstances surrounding the voluntary statements given to the Alcohol Tax Unit agents by him; his close contact with those agents; the witness fees he received; and other collateral inquiries not pertinent now. The cross-examination was persistent and minutely probing. It searched every aspect of the relationship between Teti and the agents in the endeavor to establish that the witness had been coached and influenced by them. At one stage, defense counsel bluntly asked the following questions, eliciting a No answer in each instance: "Are you on the payroll of the Alcohol Tax Unit?"; "Are you what they call a paid informer?"; "You have never been a paid informer?"; "Are you what they sometimes call a special agent in special cases who gets paid a certain amount of money for whatever you may be able to do?" Although the record is choked with such innuendos, Teti's testimony throughout the cross-examination fails to lend them the slightest credence. There was no attempt by the defense to offer any affirmative evidence in support of its questions along this line.
 
 
 6
 In his redirect examination Teti clarified certain portions of his testimony and re-affirmed the absence of any coaching or other undue influence.
 
 
 7
 On recross-examination the tactic utilized by defense counsel on cross-examination, was resumed. In response to defense counsel's questions Teti said that on the previous day when the court was not in session, an agent of the Alcohol Tax Unit had gone to Teti's home to pick him up and to give him certain witness fees. As the attorney insisted on further details of the association of the witness with the Alcohol Tax agents and the reasons therefore, the testimony continued:
 
 
 8
 "Q. And where did you meet him? You must have met him sometime that day. Now, tell us where you first met him that day. A. I met him in my home.
 
 
 9
 "Q. He came down to your home on Friday, you mean, is that right? A. Yes.
 
 
 10
 "Q. What time did he come down to your home? A. I don't recall the time, but I would say it was about 9:00 o'clock in the morning.
 
 
 11
 "Q. Now, were you dressed when he came there or had you expected him there? A. I had expected him there.
 
 
 12
 "Q. Had you told him you wanted some more money? A. No, sir.
 
 
 13
 "Q. How did you expect him there? Did he tell you that he was coming down? A. No, sir.
 
 
 14
 "Q. Well, how did you expect him there if he didn't tell you he would be down? A. Well, I have been threatened in this case, sir."
 
 
 15
 Following the last answer the defense attorneys immediately moved for a mistrial. In denying their motions, the trial judge correctly held that:
 
 
 16
 "I can't agree with counsel that the answer is unresponsive. I think it is completely responsive, at least, it starts his response. I assume from the words that he did not complete his response. It, at least, is a start of a logical response as to what he was doing with the Government agent on the day when, during the trial, the court was not in session. I would interpret it as being the start of a response elicited by defense counsel by his probing, and it seems to me a perfectly logical answer to anticipate. I, consequently, will not allow the mistrial which, I think, is no possible cause for a mistrial in reference to this situation which has been caused by defense counsel. I do not see how they can complain."
 
 
 17
 Appellants urge that the answer and the inferences to be drawn therefrom were highly prejudicial and the motion for mistrial should have been granted. It seems to us that, in the context of the entire course of the cross and recross-examination, the answer was a natural and spontaneous response to the question. Teti had said that he expected the agent at his home that day. In seeking to uncover the precise reason why the agent had been looked for by Teti, defense counsel pinpointed his query. The answer was at least the beginning of the explanation. Defense counsel, having persistently pursued that line of interrogation, cannot complain when the answer received is not tailored to fit their suggested theory. The well recognized rule that where an attorney puts this broad type of question, generally speaking, he cannot object to the response he receives is applicable. United States v. Apuzzo, 2 Cir., 1957, 245 F.2d 416; Clum v. Guardian Life Ins. Co., D.C.M.D.Pa. 1938, 24 F.Supp. 396, reversed on other grounds Guardian Life Ins. Co. of America v. Clum, 3 Cir., 1939, 106 F.2d 592; Fidelity & Deposit Co. of Maryland v. Lindholm, 9 Cir., 1933, 66 F.2d 56, 89 A.L.R. 279; Pabst Brewing Co. v. E. Clemens Horst Co., 9 Cir., 1920, 264 F. 909. In the Apuzzo trial, supra, defense counsel on cross-examination of a government agent propounded a question to him concerning the conversation between the agent and the defendant at the time of the latter's arrest. The witness answered that the defendant told him "he had been arrested for policy 15 years ago." Notwithstanding the inadmissibility of the statement, the Second Circuit held that defense counsel, having pursued this line of inquiry, could not object to the response elicited.
 
 
 18
 This appeal contains an even stronger factual basis for applying the rule, since the answer was responsive and admissible as relevant to the purpose of the cross and recross-examination, i. e., why was Teti in such close contact with the government agents. If the statement had effect at all, it was to clarify in some respects, the reasons why there was such close contact, and to neutralize the adverse inferences suggested, but never substantiated, by the defense attorneys.
 
 
 19
 Appellants further argue that: "Counsel for the Appellants had no reason to believe that the witness would in his answer, say that the agent's visit was occasioned by some threats made against the witness' life." (Emphasis supplied). The latter part of the assertion is incorrect. There was no reference to Teti's life being threatened, but only his statement: "I have been threatened in this case, sir." The supporting legal contention implies an element of surprise in the answer. It is inappropriate.
 
 
 20
 In order that the full picture be developed and all necessary relevant evidence given the jury, considerable latitude in the examination of witnesses is allowed. As a corollary counsel must accept the hazard of uncovering evidence which although relevant, is unfavorable to his position. Chief Judge Clark puts this very well in United States v. Apuzzo, supra, 245 F.2d at page 422:
 
 
 21
 "It is inconceivable that defense counsel experienced in criminal cases would have indulged in all the extended cross-examination of the government agents without appreciation of the risk involved. His hope of finding some inconsistencies in the evidence must have been tempered by knowledge of the risk of turning up something he would not like. But in any event the sound general principle that a litigant cannot object to, or secure a mistrial for, evidence he himself produces cannot be controlled by the degree of naïveté or sophistication of counsel. So far as the prosecution is concerned, there is nothing remotely to suggest impropriety on the part of the United States Attorney or indeed on the part of the witness unless answering responsively to a direct question can be so termed. But further, the implication that somehow the testimony should be geared to the defendant's objections is surely a dangerous one. It is hard to see how reversal here can be had without the implication that testimony should be manipulated, the last thing this court should even suggest."
 
 
 22
 Appellants also contend that the district attorney's summation was highly prejudicial because of two remarks made by him in his closing argument: (1) a reference to the testimony of the witness Teti that he had been threatened; (2) a reference to the defendants that they were not Sunday School people. Regarding the former, since the statement was rightly part of the trial evidence allusion to it was proper. United States v. Sober et al., 3 Cir., 1960, 281 F.2d 244. As to the latter, it is argued in appellants' brief that the comment was a direct attack on the "character of the Appellants, without any support from the evidence * * *."
 
 
 23
 Bearing in mind the cardinal principle that: "Every defendant is of course jealously protected against inflammable statements, [and] against prejudicial statements not based upon the evidence or fair and reasonable deductions from it * * *," United States v. Sober, supra, 281 F.2d at page 250, examination of the closing argument of the district attorney shows it to be within the bounds of fair comment. The statement was not a part of a persistent and calculated attack on the character of the defendants, but merely a single passing observation in a dignified, earnest summation. Berger v. United States, 1935, 295 U.S. 78, 89, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Sober et al., supra; United States v. Kravitz et al., 3 Cir., 1960, 281 F.2d 581; United States v. Stirone, 3 Cir., 1958, 262 F.2d 571, 577, reversed 1960, on other grounds 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252. It was, if anything, far more kind to the defendants than their own actions as described on the witness stand. This court recently stated in United States v. Kravitz, supra, 281 F.2d at page 586: "To say that this remark would have a prejudicial effect on a jury which had listened throughout a long trial to the unfolding of the testimony is to attribute a stupidity and absence of common sense which is incredible in a federal jury." Finally, appellants complain of the court's refusal to grant a mistrial under the below set out circumstances.
 
 
 24
 To establish one of the overt acts charged in the conspiracy count, the district attorney had introduced some testimony concerning a garage on 63rd Street, Philadelphia. Teti stated that he had gone to the garage with Esposito; that the latter waited in the car; that there was some alcohol in the garage; that a panel truck drove in which he helped load with alcohol and "we left right after that." In addition there was evidence that Marzullo had leased the garage premises and a few days after the raid on the still site had assigned the lease to appellant Diccio.
 
 
 25
 The district attorney was asked by the court if he would be able to tie in the 63rd Street garage and its alcohol with the Vineland still about which there had been evidence. The district attorney was allowed time to reappraise his information. Later he advised the court he would be unable to connect the garage and its alcohol with the Vineland still.
 
 
 26
 Motions for mistrial were made for the defendants. Thereafter the trial judge, in recessing for the day, told the jury that the district attorney had advised him that the government could not connect the 63rd Street garage to the alleged conspiracy or the alleged still in Vineland. Continuing he said: "I, therefore, instruct you that all testimony concerning the garage on North 63rd Street in Philadelphia is stricken from the record. It is, therefore, not to be considered by you, in the slightest degree, in your ultimate considerations and deliberations in this matter." He repeated this; asked the jurors to consider over night, whether, despite his ruling, they or any of them would still be prejudiced by the eliminated testimony. He concluded by saying to them:
 
 
 27
 "If there is any member of the jury who honestly feels that you cannot completely eliminate and eradicate from your mind to the extent that you will not allow it, in the slightest degree, to bear upon your ultimate consideration in this case, the testimony that has entered the case regarding the 63rd Street garage, and the activities that were engaged in there, now being stricken, that you can't likewise, mentally and morally strike it from your mind, strike it from your consideration of this case, I wish such juror or jurors would so advise me when you return in the morning."
 
 
 28
 The next morning the court talked to the jurors again about the obligation of eliminating the garage testimony from any and all of their consideration of the case. He explained that if any of them were unable to do so that there will be absolutely no comment, no criticism, no argument, in the slightest degree. He then asked each juror separately whether the particular testimony would enter into the juror's consideration of the evidence. Each juror answered "No."
 
 
 29
 The testimony involved had been admitted into evidence on the expectation that it would be connected up with the conspiracy count. The record is convincing that this was the district attorney's intention in good faith. What happened was that the witness Teti failed among other things (he too was in good faith we think) to make the exact street number identification of the 63rd Street garage where he had loaded some alcohol.[2] The judge thereupon struck all reference to the 63rd Street garage from the record. At that time there was no proof that the garage leased to Marzullo was where Teti had stopped; no proof even that the alcohol in the garage, some of which Teti helped load on a truck, was involved in an illegal operation.
 
 
 30
 Study of the full transcript of this long trial (from November 10, 1959 to November 27, 1959 with ten actual trial days) satisfies us that the 63rd Street garage evidence would have been at most some fringe benefit to the government's strong main case which for all of the indictment counts was focused on the Vineland still and the Queen Street garage. So the problem was one for the sound discretion of the court. And the record leaves no doubt but that the district judge, acutely aware of his responsibility and aided by the considered view of the jury, reasonably decided the motion. United States v. Maggio, 3 Cir., 1942, 126 F.2d 155, 159; United States v. Lubertazzi, 3 Cir., 1960, 283 F.2d 152; Dolan v. United States, 8 Cir., 1955, 218 F.2d 454, 460. Here, as in Lubertazzi, supra, there is no field for discussion of Marshall v. United States, 1959, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed. 2d 1250.
 
 
 31
 The judgment of the district court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 The first count of the indictment was for conspiracy under Title 18 U.S.C. § 371 to commit the substantive crimes enumerated in Counts 2, 3 and 4. The second count was for engaging in and carrying on the business of a distiller without having given bond, with intent to defraud the United States of the tax on distilled spirits, contrary to Title 26 U.S.C. § 5606. The third count was for having in their possession and under their control a still set up for the making and distilling, alcoholic liquor which had not been registered as required by Title 26 U.S.C. § 5174(a). The fourth count was for making and fermenting mash fit for distillation on premises other than a distillery duly authorized according to law, contrary to Title 26 U.S.C. § 5216(a) (1)
 
 
 [2]
 He had only been to the place that once, he said