**UNITED STATES of America,**
**Appellee,**

v.

**Frank PIZZI, Appellant in No. 72–1347,**
**and Robert Rocco ("Bobby") Russo.**

**Appeal of Robert Rocco RUSSO,**
**in No. 72–1348.**

**Nos. 72–1347, 72–1348.**

United States Court of Appeals,
Third Circuit.

Submitted Oct. 16, 1972 in No. 72–1347.

Argued Oct. 16, 1972 in No. 72–1348.

Decided Dec. 12, 1972.

Paul Alongi, Alongi, Bregg & DeVito, Bloomfield, N. J., for Frank Pizzi.

Lawrence S. Schwartz, Belleville, N. J., for Robert Rocco Russo.

G. Donald Haneke, Asst. U. S. Atty., Newark, N. J., for appellee.

Before GIBBONS and JAMES ROSEN,* Circuit Judges and LAYTON, Senior District Judge.

OPINION OF THE COURT

PER CURIAM:

Frank Pizzi and Robert Rocco ("Bobby") Russo were indicted for conspiring to use extortionate means in an attempt

---

* Judge Rosen participated in the conference following the argument of this case but died before this opinion was filed.

to collect an extension of credit to Robert Roy Russo (no relation to the defendant) and for knowingly using extortionate means in collecting this loan, both in violation of the Consumer Credit Protection Act, 18 U.S.C. § 894. The defendants were tried jointly and a jury returned a verdict of guilty as to each defendant on both counts.

Appellants have raised numerous points of error, the first being that the convictions are not supported by the evidence. Appellant Russo contends that the evidence was insufficient to support a conviction on either the conspiracy charge or the substantive count and that this motion for a new trial should have been granted. Appellant Pizzi contests the denial of his motion for acquittal on the conspiracy count alone. In either case, the motion must be denied and the verdict sustained if it is supported by substantial evidence, taking the view most favorable to the Government. United States v. Hamilton, 457 F.2d 95 (3rd Cir. 1971); United States v. De Cavalcante, 440 F.2d 1264, 1273 (3rd Cir. 1971).

■ The case for the prosecution consisted largely of the testimony of three witnesses covering a series of events extending for three weeks in January 1970 following a loan from defendant Russo to the prosecuting witness, Robert Russo, until the pressure on Robert Russo reached the point that he called the police and FBI for help. A fair reading of the happenings over this period, which would take pages to relate in detail, compels the conclusion that there was not only sufficient evidence to support the prosecution's case but also to establish a conspiracy. Admittedly, much of this testimony was that of the prosecuting witness, the veracity of which was severely questioned by defendants. But it is the jury's function, not ours, to determine the credibility of the witnesses. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Clearly, the jury believed the prosecution witnesses.

■ Perhaps a more serious challenge to the conviction below is appellant Russo's argument that the prosecutor's summation exceeded the bounds of fairness by attributing other criminal conduct to the defendants and by making other accusations regarding Frank Pizzi's conduct, all of which were unsupported by the testimony and were prejudicial to a fair hearing of the charges then being considered by the jury. Chief among the remarks in the first group were comments by the prosecutor that the defendants were going to take over the Pink Pussy Cat Lounge apparently for illegal purposes, and later, that "they were going to buy the Pink Pussy Cat and turn it into what they were going to use it for, NBHS."[1] Of a similar nature, the prosecutor queried, "What's going on at Pat's gas station? . . .

There were a lot of strange people there." These comments appellant urges not only were unsupported by the fact but were prejudicial because they tended to attribute greater criminal activity to the defendants than that with which they were charged, implying even that they may have been involved in organized crime.

Another remark complained of was the statement, "everybody testifies to facts of threats, beatings." And with respect to defendant Pizzi, the prosecutor stated that on the Saturday Robert Russo worked at the gas station, Pizzi was "twirling his gun." He also noted that Pizzi had "contacts at the Bloomfield Police Department" and was a man "who loves to go out on the town and find a girl every night."

Our initial inquiry here is whether these remarks are supported by the record. United States v. Barbone, 283 F.2d 628, 632 (3rd Cir. 1960). A thorough evaluation of the record leads to the conclusion that these comments read in

I. Robert Russo testified that the term "NBHS" was used by defendant Pizzi to indicate: numbers, bookmaking, horses and shylocking.

context were within the bounds of reasonable inference from that evidence. There was the testimony of Nancy Rivera, whose mother owned the Pink Pussy Cat Lounge, that Frank Pizzi was negotiating its purchase. This was corroborated by correspondence introduced in evidence between counsel for the buyer and seller. Pizzi himself admitted to Carol and Robert Russo that he and his partner, Bobby, were going to buy it and wanted Robert Russo to work there. They testified that the activity sounded illegal to them but Pizzi assured them he could keep Robert Russo out of trouble. Moreover, on another occasion, Robert Russo was told he could "square himself" by doing NBHS at his place of employment. Similarly, there was testimony that many people used Pat's gas station as a place to get together, that although cars came in, little gas was pumped and that Pizzi, when there, had on sports clothes and spent his time on the telephone.

Certainly, all three witnesses for the prosecution testified to threats. The account of assaults by Robert Russo was corroborated by the observation of Linda Palmisano. Pizzi himself admitted to Robert and Carol Russo that he had connections with the police, and on two occasions, Robert Russo observed him talking with police officers. The testimony on Frank Pizzi's night life, his relations with Linda Palmisano, and by his own testimony, at least two meetings with prostitutes during the three week period in January, provided support for other remarks of the prosecutor. Finally, there was much testimony regarding Frank Pizzi's gun and his willingness to use it. Despite the absence of evidence

specifically to support the "twirling" incident, we do not find this remark alone enough to constitute reversible error.

This does not say that we condone the remarks made by the prosecutor during summation. They are of doubtful propriety. Although supported by the testimony, they approach the outer limits of permissible inference from that evidence, and in other circumstances, they might have constituted reversible error.

The record here, however, reveals that the contest was hard fought and both sides " 'clash'd on their sounding shields the din of war.' " United States v. Stirone, 262 F.2d 571, 577 (3rd Cir. 1958). The evidence consisted almost entirely of testimony with the witnesses on each side supporting theories violently opposed. Credibility was virtually the entire issue before the jury. Moreover, when comparing the arguments of defense counsel on summation, we cannot say that the prosecutor took greater liberty in drawing inferences from the evidence.[2] Finally, it is significant that no objection was made by defense counsel at the end of summation or the following morning before the judge instructed the jury. Although the absence of objection need not be decisive, we do not find this case to present exceptional circumstances which permit us to ignore this omission. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238–239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Lawson, 337 F.2d 800, 807 (3rd Cir. 1964).

We have also reviewed the numerous other contentions raised by appellants and find them to be without merit.

The judgment of the District Court will be affirmed.

2. Counsel for appellant Pizzi likened the trial to a movie which at first glance might be entitled "The Great Loan Sharker, Frank Pizzi," but which counsel theorized should more accurately be called "The Great Con Man. The Greatest Con Job Ever Produced, Robert Roy Russo." His explanation was in large part based on marital conflicts of Robert and Carol Russo totally unfounded on the record except for the fact that they have since separated.